[No. C019219. Third Dist. Apr. 29, 1996.]

MONTEREY MECHANICAL COMPANY, Plaintiff and Appellant, v. SACRAMENTO REGIONAL COUNTY SANITATION DISTRICT, Defendant and Respondent;
HOFFMAN CONSTRUCTION COMPANY OF CALIFORNIA, INC., et al., Real Parties in Interest and Respondents.

## COUNSEL

McInerney & Dillon, William H. McInerney and Eamonn P. Conlon for Plaintiff and Appellant.

Robert A. Ryan, Jr., County Counsel, and Robert L. Pleines, Assistant County Counsel, for Defendant and Respondent.

Stanton, Kay & Watson, Elmer R. Malakoff, Lawrence H. Kay and Kelly A. Ryan for Real Parties in Interest and Respondents.

## OPINION

PUGLIA, P. J.—In this appeal, we conclude Public Contract Code section 2000, subdivision (b) contains the exclusive criteria for determining if a prime bidder on a contract for a public works project has made a good faith effort to comply with the affirmative action goals and requirements established by the local government agency awarding the contract. (Further statutory references to sections of an undesignated code are to the Public Contract Code unless otherwise noted.)

Plaintiff, Monterey Mechanical Company, submitted the low bid on a contract to construct a public works project for defendant Sacramento

Regional County Sanitation District (District). The District rejected plaintiff's bid for failure to demonstrate it had made a good faith effort to comply with the District's affirmative action goals. The District awarded the contract to the second lowest bidder, the respondent Hoffman/Marmolejo. Plaintiff commenced this proceeding for a writ of mandate to compel the District to set aside its award of the contract to Hoffman/Marmolejo and to award it instead to plaintiff. The superior court denied the writ. We shall reverse.

## I

As a general rule, contracts issued by local sanitation districts in excess of $25,000 must be awarded to the lowest responsible bidder. (§ 20783.) Section 2000 establishes an exception to the general rule by according local government agencies discretion to impose affirmative action obligations on prime contractors for public works projects. It reads in relevant part:

"(a) Notwithstanding any other provision of law requiring a local agency to award contracts to the lowest responsible bidder, any local agency may require that a contract be awarded to the lowest responsible bidder who also does either of the following:

"(1) Meets goals and requirements established by the local agency relating to participation in the contract by minority business enterprises and women business enterprises . . . .

"(2) Makes a good faith effort, in accordance with the criteria established pursuant to subdivision (b), prior to the time bids are opened, to comply with the goals and requirements established by the local agency relating to participation in the contract by minority or women business enterprises."[1]

Section 2000, subdivision (b) lists 10 criteria for assessing good faith in attempting to comply with local agency affirmative action goals and requirements. Compliance with these criteria "shall create a rebuttable presumption, affecting the burden of producing evidence, that a bidder has made a good faith effort to comply with the goals and requirements relating to participation by minority and women business enterprises . . . ." (§ 2000, subd. (c).)

## II

On January 11, 1994, the District issued a "Notice to Contractors" soliciting bids for the "Sacramento Regional Wastewater Treatment Plant, Anaerobic Digester Expansion, Contract 1" (the contract). Addendum No. 1 to the

---

[1]The full text of section 2000, subdivision (b) is reprinted in the appendix.

contract documentation incorporated a section 00587, entitled "MINORITY-OWNED AND WOMEN-OWNED BUSINESS ENTERPRISE PARTICIPATION REQUIREMENTS," setting the District's goals for participation of minority business enterprises (MBE's) and women business enterprises (WBE's) at 12.5 percent and 9.5 percent respectively.[2] Under section 00587, a bidder, to be considered "responsive" and hence eligible for award of the project, must satisfy one of three requirements: (1) be a certified MBE or WBE; (2) meet or exceed the stated MBE and WBE goals; or (3) "[d]emonstrate, to the satisfaction of the [District], fulfillment of good faith efforts (GFE) to achieve these goals . . . ." Section 00587 lists criteria for assessing good faith effort which differ somewhat from those in section 2000, subdivision (b).[3]

Plaintiff endeavored to secure MBE and WBE participation but was unsuccessful in meeting the District's goals. Plaintiff was, however, the low bidder on the contract at $65.8 million. The second lowest bidder, Hoffman/Marmolejo, came in at $66,475,000. Hoffman/Marmolejo is a joint venture of Hoffman Construction Company of California, Inc., and Marmolejo Contractors, Inc. Hoffman has an 87.5 percent share and Marmolejo a 12.5 percent share. Marmolejo is an MBE.

Plaintiff is not a certified MBE or WBE. Since plaintiff did not meet the designated MBE and WBE goals, it submitted documentation regarding its efforts to achieve those goals. On April 12, 1994, and again on April 19, the District's board (Board) met to consider the submitted bids. The Board ultimately concluded plaintiff was not a "responsive" bidder as it failed to demonstrate a good faith effort to meet MBE and WBE requirements. The Board awarded the contract to Hoffman/Marmolejo.

The superior court denied plaintiff's petition for writ of mandate to compel the District to set aside its award of the contract to Hoffman/Marmolejo and to award it instead to plaintiff, concluding the District did not abuse its discretion in determining plaintiff failed adequately to satisfy the good faith criteria of section 00587.[4]

---

[2]Section 00587 is not a part of the Public Contracts Code. We are unable to ascertain its provenance but we assume it is part of a local ordinance applicable to the District. Henceforth we shall refer to it as section 00587.

[3]The good faith criteria of section 00587 are set forth in full in the appendix.

[4]Plaintiff sued in federal district court alleging both its state law claim and a denial of equal protection of the law as guaranteed in the Fourteenth Amendment of the United States Constitution. (*Richmond* v. *J. A. Croson Co.* (1988) 488 U.S. 469 [102 L.Ed.2d 854, 109 S.Ct. 706]; *Adarand Constructors, Inc.* v. *Pena* (1995) 515 U.S. __ [132 L.Ed.2d 158, 115 S.Ct. 2097].) The federal court abstained from hearing the state-law claim and stayed the federal claim pending resolution of the state-law claim in state court.

## III

■ Although plaintiff sought relief under both traditional (Code Civ. Proc., § 1085) and administrative mandamus (Code Civ. Proc., § 1094.5), it is clear this matter is governed by traditional mandamus. (See *Taylor Bus. Service, Inc.* v. *San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1339 [241 Cal.Rptr. 379].) The decision of the District to award the contract to Hoffman/Marmolejo did not result from a proceeding in which a hearing is required by law and evidence must be taken. (See Code Civ. Proc., § 1094.5.) The decision was based on the documentation presented by the several bidders. Under traditional mandamus, our review is "limited to an examination of the proceedings before the agency to determine whether its actions have been arbitrary or capricious, entirely lacking in evidentiary support, or whether it failed to follow proper procedures or failed to give notice as required by law. [Citations.]" (195 Cal.App.3d at p. 1340.)

## IV

■ We first address plaintiff's contention the Board failed to consider supplemental information provided by plaintiff between its meetings on April 12 and April 19. This contention is not supported by the record. Plaintiff argues the District staff "made no evaluation of the additional information submitted." Plaintiff relies on the declaration of its attorney, averring that "Robert L. Pleines, counsel for the District, told me that the District had made no *written* evaluation of [the supplemental information]." (Italics added.) However, the absence of a *written* evaluation hardly forecloses the possibility. District staff considered and evaluated the information. Plaintiff also argues the District engineer "made it clear in his recommendation to the Board he did not consider [the supplemental information]." However, the only thing the engineer made clear was that he had not considered the supplemental information 10 days earlier, *when he had not yet received it.*[5] Plaintiff ignores the engineer's statement at the beginning of the meeting: "Mr. Chairman, members of the Board, you heard exhaustive testimony on this at the last meeting. And, since then, I've furnished you the good faith efforts documentation of two bidders. I furnished you copies of the nine items included in our contract documents that are supposed to be responded to document a good faith effort. *And you've also received some*

---

[5]Doug Fraleigh, the District engineer, testified: "and the—right now—my judgment 10 days ago is that [plaintiff] may well have indeed made a good faith effort. I felt it was not documented. Having received some information that clarifies and supplements what they sent me before, I do not know how I would have felt 10 days ago had I had the information at that time, quite frankly. It's obviously—it—it shows that they did some things that I don't feel were included in their original submittal."

supplemental information from the first and the second bidder." (Italics added.) We reject plaintiff's contention the District did not evaluate its supplemental submission.

V

We consider the District's rejection of plaintiff's bid. The bid documents incorporated the good faith criteria of section 00587. District staff submitted to the Board a summary of plaintiff's good faith efforts in relation to these criteria. In the summary, staff took issue with plaintiff's efforts regarding initial written notification and telephone follow-up to minority or women business enterprises (M/WBE's), plaintiff's rejection of certain M/WBE bids, and plaintiff's showing regarding assistance provided to M/WBE's to remedy bid deficiencies. Staff concluded: "It is our opinion that the contractor has failed to document a diligent good faith effort which could be expected to produce the level of M/WBE participation established for this project." The Board adopted as its findings the staff summary with additional findings that plaintiff "did not adequately and timely follow up on its contacts" and "did not provide timely and complete notice as of the bid date change."

■ Plaintiff contends the District was without authority to assess good faith effort according to the criteria listed in section 00587 insofar as they differ from the criteria listed in section 2000, subdivision (b). According to plaintiff, section 2000, subdivision (b) contains the exclusive criteria for assessing good faith effort to satisfy affirmative action goals. We agree.

Section 2000, subdivision (a)(2) provides that a bidder may satisfy a local agency's affirmative action goals and requirements either by meeting them or by making a good faith effort to do so, "in accordance with the criteria established pursuant to subdivision (b)." This provision contemplates that a local agency which imposes affirmative action obligations on its contract bidders will establish good faith criteria "pursuant to subdivision (b)." We must decide whether and to what extent a local agency may modify the criteria listed in section 2000, subdivision (b) or adopt different criteria.[6]

■ In matters of statutory construction, we are governed by well-settled principles. Our fundamental concern is with the intent of the Legislature. (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406].) We begin with the language of the statute. If it is clear, there is no need to resort to other indicia of intent. (*Ibid.*)

---

[6]The District is a local agency within the meaning of section 2000, subdivision (a). (§ 2000, subd. (d).)

The language of section 2000 is clear. It provides a local agency may award a contract "to the lowest responsible bidder" who makes a good faith effort to comply with the agency's affirmative action "goals and requirements" according to the criteria "established pursuant to subdivision (b)." (§ 2000, subd. (a)(2).) Subdivision (b) lists 10 criteria in substantial detail. Several of these criteria allow some latitude for accommodation to meet local circumstances. For example, section 2000, subdivision (b)(3) requires the bidder to advertise in one or more newspapers, trade association publications, or other such media "specified by the local agency." Section 2000, subdivision (b)(4) requires the bidder to provide written notice "to the number of minority or women business enterprises required to be notified by the project specifications." Section 2000, subdivision (b)(8) requires the bidder to negotiate in good faith with M/WBEs and not "unjustifiably" reject M/WBE bids, "as determined by the local agency." Finally, section 2000, subdivision (b)(10) specifies: "The bidder's efforts to obtain minority and women business enterprise participation could reasonably be expected by the local agency to produce a level of participation sufficient to meet the goals and requirements of the local agency."

The statute which added section 2000 is a part (§ 2) of chapter 1060 of the 1986 Statutes (the statute). Uncodified section 3 of the statute reads in relevant part: "The Legislature finds and declares that existing statutes requiring that contracts be let to the 'lowest responsible bidder' have prevented many local agencies from considering the responsiveness of a bidder to affirmative action or minority or women business enterprise requirements. *The Legislature further finds and declares that it is necessary to establish uniformity in determining whether or not bidders on public works contracts have made a good faith effort to meet the goals and requirements established by a local agency regarding the participation in the contract of minority business enterprises and women business enterprises. . . .*" (Stats. 1986, ch. 1060, § 3, p. 3723, italics added.)

Uncodified section 4 of the statute further substantiates the legislative purpose to achieve uniformity: "It is the intention of the Legislature through the enactment of Sections 2 and 3 of this act *to occupy the whole field* of the regulation of procedures for determining good faith efforts by bidders on public works contracts. Thus, *if a local agency determines to exercise the authority granted by subdivision (a) of Section 2000 of the Public Contract Code, the requirements imposed by that section shall, except as otherwise provided in subdivision (g) of that section* [excluding contracts funded by the federal government or contracts with designated local transportation districts], *be the exclusive procedure for determining whether bidders have made*

*a good faith effort to meet the goals and requirements established by the local agency regarding participation in contracts by minority business enterprises and women business enterprises. . . .*" (Stats. 1986, ch. 1060, § 4, p. 3723, italics added.)

The District contends the foregoing provisions do not preclude a local agency from adopting different criteria for assessing good faith effort. The District notes section 4 of the statute specifies that section 2000 establishes the exclusive "procedure" for determining good faith effort, and argues that procedure is to be distinguished from the substantive "criteria" to be applied. Hoffman/Marmolejo continues with this theme, arguing section 2000, subdivision (a) requires a bidder to comply with the "goals and requirements" established by a local agency, or make a good faith effort to do so, and section 2000, subdivision (b)(10) requires that the bidder's good faith efforts reasonably be expected to meet the "goals and requirements" of the agency. According to Hoffman/Marmolejo, section 00587 establishes "requirements" of the District rather than "criteria" for assessing good faith effort.

The suggested distinctions are punctilious, not persuasive. "Procedure" and "requirements" are used in uncodified section 4 of the statute interchangeably. Thus, according to section 4, if the local agency chooses to exercise the authority granted by section 2000, subdivision (a), "the *requirements* imposed by that section" shall be "the exclusive *procedure* for determining" good faith effort. (Italics added.)

Use of the phrase "goals and requirements" in section 2000 cannot be read implicitly to authorizes the imposition of additional good faith criteria. If, as Hoffman/Marmolejo contends, local agency "criteria" for assessing good faith effort are the "requirements" referred to in section 2000, this contemplates that a bidder is required to comply with these "requirements" (criteria) in order to demonstrate it has made a good faith effort to comply with the criteria ("requirements") established by the local agency. In matters of statutory construction we avoid interpretations which lead to absurd results. (*Lampley* v. *Alvares* (1975) 50 Cal.App.3d 124, 128-129 [123 Cal.Rptr. 181].)

The more reasonable interpretation of the term "requirements" as used in section 2000 may be gleaned from examination of the provision as a whole. ▪ "The meaning of the words of a statute . . . can only be determined with reference to the context in which the words are used; that is, with reference to such purpose as may be discerned from examining the entire enactment of which the words are part." (*Leslie Salt Co.* v. *San*

*Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 614 [200 Cal.Rptr. 575].) ██ As previously noted, several criteria within section 2000, subdivision (b) are written to afford the local agency some measure of latitude. Section 2000, subdivision (b)(3) requires the bidder to advertise in one or more publications "specified by the local agency." Section 2000, subdivision (b)(4) requires the bidder to provide written notice "to the number of minority or women business enterprises required to be notified by the project specifications."

In our view, the word "requirements" as used in section 2000 refers to the foregoing provisions. Although the Legislature intended section 2000, subdivision (b) to comprise the exclusive criteria for assessing good faith effort, the statute allows the local agency to specify requirements with respect, for example, to advertising the bid and the number of M/WBE's to be notified by the bidder. To interpret "requirements," as the District and Hoffman/Marmolejo would do, as an open-ended invitation to graft wholly new criteria onto those expressly set forth in section 2000, subdivision (b) would be inconsistent with the express legislative intent set forth in section 4 of the statute to "occupy the whole field" and impose the "exclusive procedure" for determining good faith efforts. (Stats. 1986, ch. 1060, § 4, p. 3723.)

## VI

We turn now to the specific findings of the Board. Item 6 of section 00587, which is essentially patterned after section 2000, subdivision (b)(8), reads: "List the names of all M/WBE businesses who submitted bids, for any of the work . . . , which were not accepted. Provide a summary of your discussions and negotiations with them, the name of the subcontractor or supplier who was selected for that portion of work, and the reasons for your choice. If the reason for rejecting an M/WBE was the price, give the price bid by the rejected M/WBE and the price bid by the selected subcontractor or supplier. *Since the utilization of available M/WBE businesses is expected, only significant price differences will be considered as cause for rejecting such M/WBE bids.*" (Italics added.)

The District staff's written summary of plaintiff's good faith efforts indicates plaintiff rejected 13 bids from MBE's or WBE's. Of these, two were rejected in favor of other MBE or WBE bids. In another case, the MBE bid had been $3,900 while that of a non-MBE was $3,034. The staff characterized the difference in these bids, $866, as not "significant" and suggested "the Contractor could have improved the documentation of a diligent good faith effort by using the higher bid of the MBE." The staff also

highlighted two other bids, one in which the M/WBE bid was $12,217 (32.3 percent) higher than that accepted by plaintiff and the other in which the M/WBE bid was $13,136 (6.7 percent) higher. The staff suggested use of the MBE or WBE bids "would have indicated a more active and aggressive effort to achieve the M/WBE participation goals."

■ Plaintiff contends the provision in section 00587, item 6, that only "significant" price differences will justify rejection of an MBE or WBE bid cannot be used in assessing good faith efforts because it is not contained in section 2000, subdivision (b). Plaintiff also contends the term "significant" is too vague to constitute an enforceable criterion; that it provides no guidance and requires a bidder to guess how much of a premium must be allowed MBE's or WBE's. Both of these criticisms are well taken.

Section 2000, subdivision (b)(8) does not require a bidder to allow a bid preference for M/WBE's in order to establish a good faith effort. Nor can such a preference be implied from the language of this subdivision. It reads: "The bidder negotiated in good faith with the minority or women business enterprises, and did not unjustifiably reject as unsatisfactory bids prepared by any minority or women business enterprises, as determined by the local agency." Rejection of an otherwise acceptable bid in favor of an equally acceptable but lower bid cannot reasonably be considered unjustifiable.

The obligation to allow a bid preference is different in kind from the other criteria of section 2000, subdivision (b). Those criteria relate primarily to efforts by bidders to facilitate or encourage submission of bids by M/WBE's rather than requiring rejection of a lower acceptable bid in favor of a higher but otherwise acceptable bid. This includes soliciting bids from M/WBE's (§ 2000, subd. (b)(3), (4), (7)), providing information to M/WBE's regarding the requirements for selected work (§ 2000, subd. (b)(6)), and assuring that M/WBE's who want to bid on a project have an opportunity to do so (§ 2000, subd. (b)(5)). Also included are designating portions of the project for performance by M/WBE's (§ 2000, subd. (b)(2)) and easing the process for submission and acceptance of M/WBE bids (§ 2000, subd. (b)(8), (9)).

The criteria outlined in section 2000, subdivision (b) are designed primarily to increase the number of subbids received from M/WBE's in order to increase the chances some will be acceptable. However, the Legislature has not imposed a requirement that a bidder accept sub-bids it would not otherwise accept, either because the M/WBE is not a "responsible" bidder, the sub-bid suffers from some deficiency which cannot be overcome with the primary bidder's assistance, or the sub-bid is higher than competing bids.

Hoffman/Marmolejo contends the bid preference of section 00587 is consistent with the requirement of section 2000, subdivision (b)(10) that the bidder's efforts "reasonably be expected by the local agency to produce a level of participation sufficient to meet goals and requirements of the local agency." According to Hoffman/Marmolejo, the District could reasonably conclude a bid preference is necessary in order to achieve the MBE and WBE goals of 12.5 percent and 9.5 percent respectively. The entire scheme of section 2000, Hoffman/Marmolejo argues, presupposes qualifying bids will be higher than nonqualifying bids as a result of the use of higher M/WBE sub-bids. In other words, it would be unnecessary to override the general rule requiring acceptance of the low bid if the bidders were not forced to accept higher sub-bids from M/WBE's.

This argument proves too much. Certainly acceptance of higher sub-bids from M/WBE's will result in greater M/WBE participation and perforce higher bids by general contractors. However, so too would a requirement that bidders accept *all* sub-bids, regardless of cost, which are submitted by M/WBE's. Yet it does not follow that acceptance of higher M/WBE sub-bids is necessary in order for primary bidders to meet the goals and requirements of the local agency. Rather, it is reasonable to assume increased efforts to encourage M/WBE bidding will result in an increased number of M/WBE bids and hence will increase the number of M/WBE bids accepted without resort to bid preferences.

Section 2000, subdivision (b)(10) cannot be read to provide local agencies discretion to impose good faith criteria beyond those designated by the Legislature. The District itself recognizes as much in that section 00587 contains a provision substantially similar to section 2000, subdivision (b)(10) which is separate and distinct from the bid preference of item 6.[7] At most, section 2000, subdivision (b)(10) provides local agencies an opportunity to scrutinize the efforts of bidders which technically comply with the other nine criteria.

The District's bid preference requirement is also void for vagueness. Bidders are left to guess what amount of bid differential will be considered "significant." Unlike the criteria listed in section 2000, subdivision (b), which require specific efforts to encourage MBE and WBE bidding, the bid preference of section 00587, item 6, requires the bidder to guess what

---

[7]Preceding the list of good faith criteria, section 00587 states: "If the bidder does not meet the M/WBE participation goals for the project, to be considered a responsive bidder with respect to the County's M/WBE participation requirements, *the bidder must be able to document that good faith efforts were pursued to an extent which could reasonably be expected to produce the level of M/WBE participation established for this project.*" (Italics added.)

premium to apply. If the bidder guesses wrong, even total compliance with all the other requirements may go for naught. The only way the bidder can guarantee a finding of good faith effort is to comply with all other good faith criteria *and* accept all MBE and WBE sub-bids, regardless of cost. The Legislature has not chosen to impose such an open-ended requirement, and the District is precluded from doing so on its own.

## VII

Item 4 of section 00587 requires the bidder to "[p]rovide a list of all M/WBE businesses solicited by direct mail, telephone, or other means. . . ." This item corresponds with section 2000, subdivision (b)(4), which requires the bidder to provide "written notice of his or her interest in bidding on the contract to the number of minority or women business enterprises required to be notified by the project specifications . . . ."

The District staff, and hence the Board, took issue with plaintiff's efforts to comply with item 4 of section 00587. In particular, the staff acknowledged plaintiff sent 62 faxes to MBE's or WBE's on February 11 and 12, but noted that 21 of these faxes did not go through and no further attempts to make contact were made. These faxes contained the original bid date of March 10. The bid date was later changed, first to March 17 and then to March 24, but plaintiff provided no written notice to the MBE's or WBE's of the changes of date. When follow-up telephone contact was made, the entities which had not received faxes were treated as if they had. According to staff, "[t]his apparent lack of attention to detail in providing initial and follow-up information to M/WBE's does not document a diligent good faith effort to meet the M/WBE goals for this project."

In addition to the faxed messages, plaintiff sent 79 letters to M/WBE's on March 1. These letters were identical to the faxes sent earlier except the bid date was listed as March 17. However, on the last page of the letter, plaintiff neglected to change the date when sub-bids were due. It remained March 10 as in the faxes. When the bid date was later changed to March 24, plaintiff made no attempt to notify the M/WBE's. The staff again concluded this inattention to detail did not demonstrate a good faith effort.

Plaintiff contends use of the 21 incomplete faxes to establish lack of good faith effort is inappropriate because 120 written notices (79 letters plus 41 faxes) were sent. Neither section 2000, subdivision (b)(4) nor item 4 of section 00587 specifies a particular number of notices required, and there is no contention the 120 notices provided by plaintiff were inadequate under the circumstances. Plaintiff's point is well taken.

By its express terms, section 2000. subdivision (b)(4) contemplates that a local agency opting to require bidders to comply with affirmative action goals will designate a particular number of written notices to MBE's or WBE's. The local agency is in the best position, based on the locality and size of the project, to assess the breadth of notification required to achieve the desired affirmative action goals. The District failed to designate a particular number of notices.

The District contends the precise number of notices is left to the individual bidders who, it claims, are better able to assess what is necessary to achieve the designated goals. According to the District, plaintiff determined the necessary number but failed to follow through.

Whether or not the individual bidders are better able to determine the necessary number of notices, the fact remains section 2000, subdivision (b)(4) contemplates the bidder will provide written notice to the number of M/WBE's "required to be notified by the project specifications." Because the project specifications here failed to designate a particular number of notices, plaintiff cannot be charged with providing too few. Plaintiff cannot be faulted any more than another bidder who is expressly directed to provide 100 notices, attempts to provide 120, but has 20 returned uncompleted.[8]

Regarding inaccuracies in the bid date, it is undisputed the date on the faxes was correct at the time they were sent. The original bid date was March 10. The change to March 17 and then to March 24 came after the faxes were sent. The bid date on the letters was also correct at the time the letters went out, although the March 10 date was inadvertently left on the last page.[9]

Plaintiff contends neither section 2000, subdivision (b) nor section 00587 expressly requires notification of changes in the bid date. This is true.

---

[8]The District argues the Board gave little if any weight to the number of notices given by plaintiff and therefore this factor cannot be considered a basis for rejecting the Board's findings. The trial court so concluded. However, this conclusion is not supported by the record. The District staff's summary discusses the fact 21 faxes were not completed and there was no further attempt at written contact. Based on this and other perceived deficiencies in notification to M/WBE's, the staff concluded: "This apparent lack of attention to detail in providing initial and follow-up information to M/WBE's does not document a diligent good faith effort . . . ." The staff findings were adopted by the Board. There is no reason to believe the failure to complete the 21 faxes played any less role in the Board's conclusions than any other perceived notification deficiencies.

[9]Plaintiff contends the date on the last page had been left at March 10 on purpose in order that sub-bids be received one week before plaintiff was required to submit its bid. This argument is contradicted by the testimony of plaintiff's president to the Board on April 19 that the March 10 date on the last page of the letters was a "typographical error" rather than a deliberate request for early sub-bids.

Nevertheless, it is reasonable for the District to conclude an obligation to provide such follow-up information is implied in section 2000, subdivision (b)(10). Arguably a M/WBE solicited to bid on a project is more likely to submit a bid if informed more time is available to do so. Even a M/WBE that initially decides not to bid on a project may have a change of mind if given more time or a second chance. An obligation to provide follow-up information is not a separate criterion of a good faith effort but an adjunct to the requirement in the first instance to provide written notice. A bare bones written notice, or even one containing inaccurate information, may technically satisfy section 2000, subdivision (b)(4), yet not be calculated to meet the agency's affirmative action goals.

Plaintiff contends it provided the date change information to potential M/WBE bidders when it telephoned those to whom it had sent letters or faxes and asked if they planned to bid on the project. One of the individuals making these calls, Matthew Malte, submitted a declaration indicating: "When I called these M/WBE's, each time I introduced myself and said that I was calling to find out if they would be bidding the [project] on March 24, 1994. Usually the person answering the phone would check their bid list, and answer 'yes', 'no', or 'I don't know.' If they answered 'yes' or 'I don't know', I asked to speak to the estimator, who would usually answer 'yes', 'no' or that he hadn't heard of the job. If they hadn't heard of the job, I gave them a short description of the work within their discipline or the name of one of our estimators handling that part of the work, and told them where plans were available. I repeated the bid date to each person who was not aware of the job. . . ."

It is for the local agency to determine whether adequate notice to potential M/WBE bidders for purposes of section 2000, subdivision (b)(4) and (b)(10) requires follow-up notice of bid date changes and whether the notification given by plaintiff here was adequate for this purpose. To the extent bidders are required to give written notice, such notice should be calculated to be effective. In appropriate circumstances, this may require follow-up notice of changed information. This determination must be left to the local agency.[10]

---

[10]Plaintiff also argues the Board improperly gave negative weight to the fact plaintiff solicited bids from eight "Disadvantaged Veteran Business Enterprises" (DVBE's). This is not supported by the record. In its summary of plaintiff's good faith effort, staff commented plaintiff included in its M/WBE compliance submission copies of eight letters to DVBE's despite the fact these cannot count toward its M/WBE obligation. The staff commented: "This indicates a lack of understanding of the requirements of the County's M/WBE Program." Rather than demonstrating negative consideration, this entry indicates the staff, and hence the

## VIII

Item 5 of section 00587 requires the bidder to "[l]ist the dates [of] and methods used for following up initial solicitations to determine with certainty whether the M/WBE businesses were interested in bidding." This corresponds with section 2000, subdivision (b)(5), which includes as a criterion of good faith whether the bidder "followed up initial solicitations of interest by contacting the enterprises to determine with certainty whether the enterprises were interested in performing specific items of the project."

As part of its good faith showing, plaintiff submitted a telephone log demonstrating it called nearly all entities which had been sent faxes or letters and asked whether they intended to submit bids. The District staff criticized the fact the 21 entities which had not received faxes were called and treated as if they had, essentially being asked if they planned to bid on a project for which they had not received written notice from plaintiff. The staff also highlighted the fact plaintiff's log indicated one particular M/WBE, Lucy Sales, declined to submit a sub-bid to plaintiff yet this same organization submitted a sub-bid to Hoffman/Marmolejo. The staff explained: "The same M/WBE is listed as a supplier for the second low bidder. The County contacted the M/WBE to ascertain the reason for not submitting a bid to this contractor. While the M/WBE could not recall this specific conversation among all the inquiries for bids received, the M/WBE did state that it had a policy to *always* submit a bid when requested, provided that the requesting contractor furnished sufficient detail of the bid requirements and allowed enough time to prepare the bid." (Italics in original.) The Board concluded plaintiff "did not adequately and timely follow up on its contacts."

The trial court held this conclusion is supported by the record because the telephone logs submitted by plaintiff reveal only perfunctory calls were made in many instances. According to the log, multiple calls were often made within the same minute. The trial court indicated this evidence did not demonstrate an effort to "encourage" MBE's or WBE's to submit bids.

█ Plaintiff contends neither section 2000, subdivision (b)(5) nor section 00587, item 5, requires bidders to "encourage" M/WBE's to submit sub-bids. We agree. The stated purpose of the follow-up calls is "to determine with certainty" if a bid will be forthcoming. The purpose of the call essentially is to gather information in order that an intended M/WBE bid not be disregarded. As plaintiff correctly points out, little time is required to ascertain whether a MBE or WBE is interested in submitting a bid.

Board, refused to give this fact any consideration except perhaps insofar as it suggests the remainder of plaintiff's submission should be examined closely.

The District contends plaintiff's follow-up efforts were nevertheless inadequate because plaintiff failed to telephone eight of the twenty-one M/WBE's who had not received a faxed notice. This is not supported by the record. The telephone log submitted by plaintiff reveals attempts were made to contact these entities. In some instances messages were left while in others there was no answer. A bidder can only place the call; it cannot force the recipient to answer the call. In any event, there is nothing in the record to suggest the Board relied on plaintiff's failure to reach these eight entities in finding plaintiff's effort inadequate. The District's reliance on this factor is therefore misplaced.

Hoffman/Marmolejo argues the shortness of the telephone calls demonstrates plaintiff made no effort to "negotiate" with MBE's or WBE's. Hoffman/Marmolejo appears to be mixing apples with oranges. Section 2000, subdivision (b)(5) does not require bidders to "negotiate" with M/WBE's any more than it requires them to "persuade" such entities to submit bids. The negotiation requirement comes from section 2000, subdivision (b)(8), which reads: "The bidder negotiated in good faith with the minority or women business enterprises, and did not unjustifiably reject as unsatisfactory bids prepared by any minority or women business enterprises, as determined by the local agency." This provision has no application to follow-up contact with potential sub-bidders. It addresses the bidder's obligations vis-à-vis M/WBE's who *have* submitted bids. The District staff and the Board had no criticism of plaintiff's efforts in this regard, except as previously discussed in connection with plaintiff's rejection of higher sub-bids from M/WBE's.

Finally, the District contends plaintiff's failure to secure a sub-bid from Lucy Sales demonstrates plaintiff was simply going through the motions and never really tried to reach the MBE or WBE goals. We agree the Board may consider plaintiff's failure to obtain a bid from Lucy Sales as evidence detracting from plaintiff's good faith showing. Any evidence suggesting a bidder's professed efforts were not as represented is clearly pertinent to the good faith inquiry. However, such evidence is relevant not because it demonstrates plaintiff failed to "persuade" Lucy Sales to submit a bid or to "negotiate" with Lucy Sales but because it bears upon the issue of credibility. If it is true Lucy Sales always submits a bid when solicited, then perhaps plaintiff did not actually solicit a bid from that company or did not follow-up with a telephone call as claimed. Although plaintiff submitted a plausible explanation for its failure to sign Lucy Sales as a sub-bidder, the Board was free to reject this explanation as self-serving.

## IX

■ Plaintiff contends the Board improperly considered its low M/WBE participation in concluding plaintiff failed to make a good faith effort. Since good faith effort is an alternative to actual achievement of the District's goals, plaintiff argues, failure to achieve those goals cannot be considered in the good faith assessment.

The record does not support plaintiff's contention the Board considered low M/WBE participation in finding a lack of good faith effort. Plaintiff relies on the following statement by one Board director during the April 12 meeting: "[T]he demonstration that someone else can do it, coupled with the clear admission of an inability to come close to doing it here, leaves me unprepared to support the low bidder . . . ." However, the District staff's findings, which were expressly adopted by the Board, contained no criticism regarding the level of plaintiff's compliance. The fact one director may have considered this fact for some purpose does not make it a basis for the Board's findings.

Moreover, although section 2000, subdivision (b) does not mention results achieved among the criteria for assessing good faith effort, it does not follow a local agency cannot consider results in assessing whether the bidder adequately complied with the other criteria. A bidder who achieves near compliance with the agency's affirmative action goals is more likely to have made a good faith effort to do so than one who falls far short. Although comparative compliance or comparative effort is not the standard, it is nevertheless reasonable for a local agency to scrutinize more closely the efforts of a bidder who does not come close to the stated goals.

Here, plaintiff achieved no more than 5.6 percent MBE and 0.2 percent WBE participation.[11] With these low numbers, it was reasonable for the Board to look more closely at, for example, plaintiff's failure to sign Lucy Sales or the shortness of the telephone calls reflected in plaintiff's telephone log. Under these circumstances, good faith effort is not being measured by the results achieved. Rather, the efforts themselves are being considered in light of the results to ascertain whether they were as represented.

---

[11]Plaintiff's claim of 5.6 percent MBE participation presumes a sub-bid from an MBE named RPS, Inc. This sub-bid was not part of plaintiff's initial submission. Instead of RPS, Inc., plaintiff used a lower sub-bid from a non-MBE, Camblin Steel. Plaintiff has requested permission to substitute RPS, Inc., for Camblin Steel. As originally submitted with Camblin Steel, plaintiff's MBE participation was only 1.4 percent. Interestingly, if RPS, Inc., had been included in plaintiff's initial bid, plaintiff would not have been the low bidder on the project.

## X

Hoffman/Marmolejo contends there is evidence in plaintiff's good faith showing from which the Board could have concluded plaintiff failed to set aside specific tasks to be performed by MBE's or WBE's. Section 2000, subdivision (b)(2) reads: "The bidder identified and selected specific items of the project for which the contract will be awarded to be performed by minority or women business enterprises to provide an opportunity for participation by those enterprises." The short answer to this contention is the District staff, and hence the Board, did not take issue with plaintiff's compliance with this requirement. Hence, we need consider this contention no further.

## XI

To summarize, section 2000 permits local government agencies to impose affirmative action obligations on prime bidders for public works projects. Where this provision is invoked, only bidders who either meet the affirmative action goals of the local agency or make a good faith effort to do so will be eligible for award of the contract. Good faith effort is to be determined strictly in accordance with the criteria enumerated in section 2000, subdivision (b). Although this provision allows local agencies some discretion in imposing specific obligations, it does not allow for creation of wholly discrete criteria.

The Board concluded plaintiff had not made a good faith effort to comply with the Board's affirmative action goals based in part upon criteria not included in section 2000, subdivision (b) but in section 00587. In particular, the Board improperly considered that plaintiff (1) rejected certain M/WBE bids which were not "significantly" higher than non-M/WBE bids, (2) failed to assure 21 faxes were received, where no particular number of written notices had been designated by the District in the bid specifications, and (3) made no effort to "persuade" M/WBE's during follow-up telephone calls to submit bids.

The Board's decision to reject plaintiff's bid was an exercise of discretion. Because the Board applied the wrong criteria in reaching its decision, it abused its discretion. (*Zador Corp.* v. *Kwan* (1995) 31 Cal.App.4th 1285, 1303 [37 Cal.Rptr.2d 754]; *Conservatorship of Scharles* (1991) 233 Cal.App.3d 1334, 1340 [285 Cal.Rptr. 325].) The award of the contract to Hoffman/Marmolejo, the second lowest bidder, must be set aside and plaintiff's good faith effort must be reevaluated in light of the exclusive criteria in section 2000, subdivision (b). (*City of Inglewood-L.A. County Civic Center*

*Auth.* v. *Superior Court* (1972) 7 Cal.3d 861, 870 [103 Cal.Rptr. 689, 500 P.2d 601]; *Rubino* v. *Lolli* (1970) 10 Cal.App.3d 1059, 1062 [89 Cal.Rptr. 320].)

## XII

■ The District and Hoffman/Marmolejo (hereafter collectively respondents) contend plaintiff is not entitled to a writ of mandate compelling the Board to set aside the award because it has an adequate remedy at law. They argue plaintiff could be compensated in damages for any losses caused by the Board's violation of section 2000. Plaintiff counters a damage award would not be an adequate remedy because the District is immune from liability in tort, and contract damages, if any, would be limited to the cost of preparing a bid. Plaintiff has the better argument.

Because the award of a public contract involves the exercise of discretion, the government employees and entities involved are immune from liability. (*Pacific Architects Collaborative* v. *State of California* (1979) 100 Cal.App.3d 110, 121-122 [166 Cal.Rptr. 184]; *Rubino* v. *Lolli, supra,* 10 Cal.App.3d at p. 1063.) Government Code section 820.2 reads: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Government Code section 815.2, subdivision (b) reads: "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." Although the court in *Swinerton & Walberg Co.* v. *City of Inglewood-L.A. County Civic Center Authority* (1974) 40 Cal.App.3d 98 [114 Cal.Rptr. 834] suggested a rejected low bidder might obtain relief on a theory of promissory estoppel, damages would be limited to the cost of preparing a bid. (*Id.* at p. 105.) This would not be an adequate remedy under the circumstances.

Respondents also contend, because mandate is an equitable remedy, that it is inappropriate here because the balance of hardships favors maintaining the award of the contract to Hoffman/Marmolejo. They rely on several declarations submitted in opposition to plaintiff's petition suggesting a significant amount of effort and expense has already been incurred by Hoffman/Marmolejo pursuant to the contract and setting aside the award now would result in increased expense to the District and delay in completion of the project.

Respondents cite no authority for the proposition that denial of a writ of mandate may be based on the balance of hardships. There are essentially two

prerequisites to issuance of a writ of mandate under Code of Civil Procedure section 1085: "(1) the respondent has a clear, present, and usually ministerial duty to act, and (2) the petitioner has a clear, present, and beneficial right to performance of that duty." (*State Bd. of Education* v. *Honig* (1993) 13 Cal.App.4th 720, 741 [16 Cal.Rptr.2d 727].) It is undisputed the District has a duty to award the contract, if at all, to the lowest responsible bidder as contemplated by section 2000. As potentially the lowest responsible bidder, plaintiff has a beneficial right in seeing the contract is properly awarded. Plaintiff may not compel the Board to award it the contract because the Board must first determine, applying the proper criteria, if plaintiff made a good faith effort to meet the District's affirmative action goals. But plaintiff does have a right to require the District to apply the proper criteria in assessing good faith effort. The trial court erred in denying plaintiff's petition for writ of mandate.[12]

The judgment is reversed and the matter remanded to the trial court with directions to issue a writ of mandate compelling the District to set aside its award of the contract to Hoffman/Marmolejo and to proceed thereafter in accordance with the views expressed in this opinion. Plaintiff is to recover its costs.

Raye, J., and Brown, J., concurred.

A petition for a rehearing was denied May 23, 1996.

---

[12]We do not consider plaintiff's contention Hoffman/Marmolejo failed to satisfy section 2000 by virtue of its joint venture arrangement. The issue in this appeal is whether plaintiff satisfied section 2000. If not, plaintiff cannot be awarded the contract and has no standing to contest the award to another.

Appendix

Public Contract Code section 2000, subdivision (b) reads:

"(b)(1) The bidder attended any presolicitation or prebid meetings that were scheduled by the local agency to inform all bidders of the minority and women business enterprise program requirements for the project for which the contract will be awarded. A local agency may waive this requirement if it determines that the bidder is informed as to those program requirements.

"(2) The bidder identified and selected specific items of the project for which the contract will be awarded to be performed by minority or women business enterprises to provide an opportunity for participation by those enterprises.

"(3) The bidder advertised, not less than 10 calendar days before the date the bids are opened, in one or more daily or weekly newspapers, trade association publications, minority or trade oriented publications, trade journals, or other media, specified by the local agency for minority or women business enterprises that are interested in participating in the project. This paragraph applies only if the local agency gave public notice of the project not less than 15 calendar days prior to the date the bids are opened.

"(4) The bidder provided written notice of his or her interest in bidding on the contract to the number of minority or women business enterprises required to be notified by the project specifications not less than 10 calendar days prior to the opening of bids. To the extent possible, the local agency shall make available to the bidder not less than 15 calendar days prior to the date the bids are opened a list or a source of lists of enterprises which are certified by the local agency as minority or women business enterprises. If the local agency does not provide that list or source of lists to the bidder, the bidder may utilize the list of certified minority or women business enterprises prepared by the Department of Transportation pursuant to Section 14030.5 of the Government Code for this purpose.

"(5) The bidder followed up initial solicitations of interest by contacting the enterprises to determine with certainty whether the enterprises were interested in performing specific items of the project.

"(6) The bidder provided interested minority and women business enterprises with information about the plans, specifications, and requirements for the selected subcontracting or material supply work.

"(7) The bidder requested assistance from minority and women community organizations; minority and women contractor groups; local, state, or federal minority and women business assistance offices; or other organizations that provide assistance in the recruitment and placement of minority or women business enterprises, if any are available.

"(8) The bidder negotiated in good faith with the minority or women business enterprises, and did not unjustifiably reject as unsatisfactory bids prepared by any minority or women business enterprises, as determined by the local agency.

"(9) Where applicable, the bidder advised and made efforts to assist interested minority and women business enterprises in obtaining bonds, lines of credit, or insurance required by the local agency or contractor.

"(10) The bidder's efforts to obtain minority and women business enterprise participation could reasonably be expected by the local agency to produce a level of participation sufficient to meet the goals and requirements of the local agency."

Section 00587 reads:

"1. Are you informed of the requirements of the County's M/WBE Participation Program for this project? Did you attend any pre-bid meetings scheduled by the District to inform bidders of the M/WBE requirements for this project?

"2. List all items of work for which you requested subbids from M/WBE businesses, including services, materials, and supplies. Describe any breakdown of items of work into economically feasible units to facilitate M/WBE participation. Describe the information you provided to interested M/WBE businesses about the plans, specifications, and requirements of the project. In order to meet this project's M/WBE participation goals, it may be necessary to subcontract to M/WBE businesses portions of work normally performed by your own forces. Did you make portions of such work available for M/WBE businesses to bid on? (Note: This does not substitute for any subcontractor list required elsewhere in the bid documents.)

"3. List the names and dates of advertisement of each newspaper, trade newspaper, minority/women focused paper, or any other media used in which a request for M/WBE subcontracting participation specifically for this project was placed by you. Provide a copy of all advertisements placed, labelling [sic] each copy with the name of each publication and the date each advertisement appeared. Did your advertisements include a clear identification of the name and nature of the project and a specific breakdown of the work to be performed? Did you advertise sufficiently in advance of the bid due date to allow M/WBE businesses adequate time to participate effectively?

"4. Provide a list of all M/WBE businesses solicited by direct mail, telephone, or other means. Include names of the businesses, addresses, telephone numbers, dates contacted, methods of contact, results of any contact with the M/WBE businesses, and items for which bids were solicited. If contact was made by telephone, also provide name of person contacted and position person holds in business. Provide copies of your telephone logs and all direct mail solicitations. In your solicitations, did you include a clear identification of the name and nature of the project and a specific breakdown of the work to be performed? Did your solicitations occur sufficiently in advance of the bid due date to allow M/WBE businesses adequate time to participate effectively?

"5. List the dates and methods used for following up initial solicitations to determine with certainty whether the M/WBE businesses were interested in bidding. Include names of the businesses, dates contacted, and results of the contact. If contact was made by telephone, also provide name of person contacted, and position person holds in business. Provide copies of your telephone logs and all direct mail correspondence. Did your follow-up contact allow sufficient time from your initial contact to allow the M/WBE businesses adequate time to participate effectively?

"6. List the names of all M/WBE businesses who submitted bids, for any of the work indicated in Item 2 above, which were not accepted. Provide a summary of your discussions and negotiations with them, the name of the subcontractor or supplier who was selected for that portion of work, and the reasons for your choice. If the reason for rejecting an M/WBE was the price, give the price bid by the rejected M/WBE and the price bid by the selected subcontractor or supplier. Since the utilization of available M/WBE businesses is expected, only significant price differences will be considered as cause for rejecting such M/WBE bids.

"7. Describe any assistance you extended to M/WBE businesses, identified in Item 6 above, to remedy the deficiency in their subbids.

"8. Provide a list of assistance groups or community-based organizations you contacted in your efforts to seek interested M/WBE businesses (minority/women community organizations, minority/women contractor's groups, local or state minority/women business assistance

offices, or other organizations that provide assistance in the recruitment and placement of M/WBE businesses). Include methods of contact, dates contacted, and results of the contacts.

"9. Provide any additional data to support a demonstration of good faith efforts to produce the level of M/WBE participation sufficient to meet the goals of this project. Include any efforts you made to assist interested M/WBE businesses in obtaining bonds, lines of credit, or meeting insurance requirements. Provide any other information that you believe relevant to participation goals and good faith efforts for this project."